IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| FRANKIE LYNN MITCHELL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) No. CIV-16-1006-M |
| v. | ) |
| | ) |
| NANCY A. BERRYHILL, | ) |
| Acting Commissioner of Social | ) |
| Security Administration, | ) |
| | ) |
| Defendant.[1] | ) |

## REPORT AND RECOMMENDATION

Plaintiff seeks judicial review pursuant to 42 U.S.C. § 405(g) of the final decision of Defendant Commissioner denying her applications for disability insurance and supplemental security income benefits under Title II and Title XVI of the Social Security Act, 42 U.S.C. §_ 416(i), 423, 1382. Defendant has answered the Complaint and filed the administrative record (hereinafter TR___), and the parties have briefed the issues. The matter has been referred to the undersigned Magistrate Judge for initial proceedings consistent with 28 U.S.C. § 636(b)(1)(B). For the following reasons, it is recommended that the Commissioner's decision be affirmed.

---

[1] Pursuant to Fed. R. Civ. P. 25(d), the Court substitutes Nancy A. Berryhill, Acting Commissioner of the Social Security Administration, as the proper Defendant in this action.

1

I. <u>Administrative Background and Agency Decision</u>

Plaintiff filed her applications for benefits in November 2011 and alleged that she became disabled on March 30, 2010. Plaintiff alleged disability due to anxiety disorder and emotional instability. Plaintiff alleged that she stopped working on March 30, 2010, because of her impairments. Plaintiff completed four or more years of college, and she had previously worked as a case manager at a correctional facility, cashier, delivery worker, pawnbroker, and zookeeper. (TR 340-341).

Plaintiff failed to appear at a scheduled administrative hearing in December 2014, although her representative appeared at the hearing. Administrative Law Judge Shepherd ("ALJ") received testimony from a vocational expert ("VE") at the hearing and later determined that Plaintiff had not shown good cause for her failure to appear at the hearing.

The medical record shows that on a monthly basis from October 2010 through October 2012 Plaintiff received prescriptions for massive doses of narcotic pain and anxiolytic medications from Dr. William Valuck. His office notes of treatment of Plaintiff contain only vague reports of Plaintiff's subjective complaints and vague diagnostic assessments without objective findings of severe impairments or test results. Public records of which the Court takes judicial notice reveal that Dr. Valuck was arrested in December 2013 and charged in January 2014 with first degree murder stemming from the overdose deaths of nine former patients and 71 counts of

unlawful distribution of controlled dangerous substances. He later pled guilty to eight counts of second degree murder and received a ten year sentence of imprisonment for each conviction. http://www.oscn.net (docket sheet in State of Oklahoma v. William Martin Valuck, Oklahoma County District Court, Case No. CF-2014-185)(last accessed June 12, 2017). Dr. Valuck voluntarily surrendered his osteopathic license in December 2013. https://www.ok.gov/osboe/#.

Plaintiff was admitted to a hospital in March 2012, where she was treated for an "acute cerebrovascular accident (thrombotic stroke)." (TR 419). Plaintiff reported that her stroke symptoms began about 14 hours before she sought treatment. (TR 417). She was discharged two days later in stable condition. At that time she exhibited only mild left-sided weakness. She was prescribed medications for hypertension and high cholesterol. Plaintiff was advised to follow up with a vascular doctor and an internist and to undergo outpatient therapy.

At a follow-up appointment in March 2012 with an internist, Dr. Ghata, the physician noted that a neurological examination of Plaintiff was normal with normal gait and coordination. Dr. Ghata noted that he encouraged Plaintiff to "continue speech, occupational and physical therapies," but there is no record that Plaintiff attended any therapy. (TR 469).

Plaintiff reported to the agency in July 2012 that she had no physical problems resulting from the stroke, although she had difficulty with her memory and had

difficulty remembering to take her medicine. (TR 363). The interviewer noted Plaintiff did not exhibit any memory deficits and quickly provided information such as her address and zip code, the date of her next doctor appointment and the location, and the date of her birthday and the stroke. (TR 363).

In a third-party function report dated May 17, 2012, Plaintiff's friend, Mr. Warden, stated that Plaintiff's ability to work was limited because of "trouble with back and thinking." (TR 353). Mr. Warden stated that Plaintiff's only activity was watching television and feeding and watering her pets. He stated that she prepared "TV Dinners," performed household chores "not very often," and needed him to remind her to take medications and care for her personal needs. (TR 355). Mr. Warden stated that Plaintiff did not go out alone because she "[g]ets lost at store" and she did not go outside "often" because she "[h]as trouble walking." (TR 356). He stated Plaintiff was taking narcotic pain and anxiolytic medications and that she "dose [sic] nothing." (TR 360).

In her own written function report, Plaintiff stated she cannot be around people because of social anxiety, that her medications "make me forgetful and since my stroke I have been worse." (TR 372). Plaintiff stated that her usual daily activities were "sleep" and "nothing." (TR 373). In another friend's third-party function report, the friend stated that Plaintiff's ability to work was limited because she "will forget what she's suppose[d] to do." (TR 380). This friend stated that

4

Plaintiff's only interest/activity was watching television and that she lacked motivation, sometimes cooked meals and performed household or yard work, shopped for food, and had no driver's license. In a second written function report dated May 14, 2012, Plaintiff reported that her ability to work was limited because "after strock [sic] can't think or rember [sic] well [and] also meds for back pain make me forgetfull [sic]." (TR 395). Plaintiff reported her usual daily activities as "set." (TR 396).

Plaintiff first sought mental health treatment in October 2013, more than three years after she alleged she became disabled due to mental impairments. A case manager at her treating mental health clinic noted that Plaintiff described anxiety and depression. Plaintiff reported to the case manager that she had been "sober" from methamphetamine abuse for six months and before that time she used "lots" of methamphetamine "very often." (TR 594). Plaintiff stated she was living in a shelter and that her former boyfriend and former husband had been physically and emotionally abusive. She also stated that "someone invaded her home about 10 years ago and took her hostage and that the anxiety problems began at that time. [She r]eported that her home was also invaded 3 years ago and last month." (TR 593). She further reported she fractured her ankle five years previously and suffered a stroke in March 2012. Plaintiff reported she had been unemployed for a couple of years because she was focusing on "getting my head straight" before starting a job

5

search. (TR 597). She reported that she wanted to get medications in order "to be able to work again." (TR 601).

At a medication clinic appointment with Dr. Haque in November 2013, Plaintiff reported that she had used methamphetamine for 10 years but had been "sober" from methamphetamine abuse for five years. (TR 609). Dr. Haque prescribed anti-depressant medications for treatment of depression and post-traumatic stress disorder ("PTSD"). Dr. Haque added a mood-stabilizing medication to her medication regimen at her next medication clinic visit in December 2013. Plaintiff returned to Dr. Haque for follow-up treatment in January and February 2014. In these visits, Dr. Haque noted that Plaintiff exhibited normal mood, speech, memory, thought processes, judgment, insight, and attention/concentration. In March 2014, Dr. Haque noted that Plaintiff's symptoms had improved, she was "doing well," and she did not report any medication side effects. (TR 624). Plaintiff was discharged from treatment at the clinic in March 2014 for noncompliance with scheduled appointments. (TR 627).

Plaintiff underwent a consultative physical examination conducted by Dr. Godlewski in May 2012. Dr. Godlewski reported that Plaintiff exhibited mildly limited range of motion in her right ankle and slightly limited range of motion in her cervical spine. Plaintiff also underwent two consultative psychological evaluations conducted by Dr. Cruse and Dr. Rodgers. The reports of these evaluations appearing

6

in the record will be discussed *infra*.

The ALJ issued a decision on March 20, 2015, finding that Plaintiff had severe mental and physical impairments of major depressive disorder, PTSD, panic disorder, status post cerebrovascular accident ("CVA"), substance addiction disorder, seizure disorder by history, hypertension, and cognitive disorder. Following the agency's well-established sequential evaluation procedure, the ALJ found that at step three these impairments, considered singly or in combination, did not medically meet or equal the requirements of a listed impairment.

At the fourth step, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work activity with exertional and non-exertional limitations. Specifically, the ALJ found that Plaintiff could occasionally climb, balance, stoop, kneel, crouch, or crawl; Plaintiff should avoid concentrated exposure to hazards such as unprotected heights and heavy machinery; Plaintiff could understand, remember, and carry out simple, routine, and repetitive tasks; and she could have no contact with the general public, although she could respond appropriately to supervisors, co-workers, and usual work situations. (TR 13).

Based on these findings, the ALJ concluded that Plaintiff was not able to perform her past relevant work. Proceeding to the fifth and final step, the ALJ found that jobs exist in the national economy which Plaintiff can perform given her vocational characteristics and RFC for work. Based on these findings, the ALJ

7

concluded that Plaintiff was not disabled within the meaning of the Social Security Act and not entitled to benefits. The Appeals Council denied Plaintiff's request for review, and therefore the ALJ's decision is the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481; Wall v. Astrue, 561 F.3d 1048, 1051 (10th Cir. 2009).

II. General Legal Standards Guiding Judicial Review

The Court must determine whether the Commissioner's decision is supported by substantial evidence in the record and whether the correct legal standards were applied. Wilson v. Astrue, 602 F.3d 1136, 1140 (10th Cir. 2010); Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir. 2003). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. It requires more than a scintilla, but less than a preponderance." Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007). The "determination of whether the ALJ's ruling is supported by substantial evidence must be based upon the record taken as a whole. Consequently, [the Court must] remain mindful that evidence is not substantial if it is overwhelmed by other evidence in the record." Wall, 561 F.3d at 1052 (citations, internal quotation marks, and brackets omitted).

The Social Security Act authorizes payment of benefits to an individual with disabilities. 42 U.S.C. § 401 *et seq.* A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or

8

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); accord, 42 U.S.C. § 1382c(a)(3)(A); see 20 C.F.R. § 416.909 (duration requirement). Both the "impairment" and the "inability" must be expected to last not less than twelve months. Barnhart v. Walton, 535 U.S. 212 (2002).

The agency follows a five-step sequential evaluation procedure in resolving the claims of disability applicants. See 20 C.F.R. §§ 404.1520(a)(4), (b)-(g), 416.920(a)(4), (b)-(g). "If the claimant is not considered disabled at step three, but has satisfied her burden of establishing a prima facie case of disability under steps one, two, and four, the burden shifts to the Commissioner to show the claimant has the residual functional capacity (RFC) to perform other work in the national economy in view of her age, education, and work experience." Fischer-Ross v. Barnhart, 431 F.3d 729, 731 (10th Cir. 2005). "The claimant is entitled to disability benefits only if he [or she] is not able to perform other work." Bowen v. Yuckert, 482 U.S. 137, 142 (1987).

III. Evaluation of Medical Source Opinions

Plaintiff asserts that the ALJ erred in evaluating the opinion of Dr. Rodgers, a consultative examiner. In her consultative evaluation of Plaintiff conducted in October 2012, Dr. Rodgers reported Plaintiff's statement that she had "struggled with mood problems for 'about four or five years'" beginning "after she was the

9

victim of a home invasion," that she had no history of mental health treatment other than medications, and that she had never been diagnosed with a mental impairment. (TR 525). Dr. Rodgers also noted that Plaintiff was "taking an anxiety medication," had "some difficulty keeping up with movies at times," "easily forgets things," and "often loses and misplaces things." (TR 525). Plaintiff reportedly described herself as tired and lethargic, irritable, lacking motivation, and feeling hopeless. She spent most of her days at home, watching television, and did not like people.

In a mental status examination, Dr. Rodgers noted that Plaintiff's exam was "unremarkable," but Plaintiff "struggled" on a cognitive assessment test, indicating "the presence of cognitive dysfunction." (TR 525). Dr. Rodgers noted Plaintiff endorsed symptoms of depression, anxiety, PTSD, and panic disorder. Additionally, Dr. Rodgers noted that Plaintiff "scored somewhat poorly on the [Montreal Cognitive Assessment], which would likely cause some difficulty when trying to understand, remember and follow through with both simple and complex instructions" although "comprehensive psychodiagnostic testing" was recommended to corroborate the diagnostic impressions set forth in the report. (TR 527).

Dr. Rodgers' opinion was vague concerning the severity of the "cognitive dysfunction" indicated on the cognitive assessment test completed by Plaintiff. Dr. Rodgers also noted that she had not reviewed the remainder of Plaintiff's medical

record. Dr. Rodgers stated in her report that her diagnostic impressions and opinions were "based solely upon [Plaintiff's] clinical presentation, reported complaints, and reported/documented history." (TR 527).

The remaining medical record reflects that Plaintiff was prescribed heavy doses of narcotic pain and anxiolytic medications by Dr. William Valuck during a three year period in 2010, 2011, and 2012. Further, Plaintiff's own statements concerning her abuse of methamphetamine conflicted with each other and showed she continued to abuse this illegal substance during 2012 and most of 2013. Plaintiff advised Dr. Cruse during a consultative examination in May 2012 for the agency that she stopped using methamphetamine 1½ years before the examination. (TR 520). She later advised Dr. Rodgers in October 2012 that she had not used methamphetamine for five years. (TR 524). A year later, in October 2013, Plaintiff advised an intake case manager at her treating mental health clinic that she had been a heavy abuser of methamphetamine until "6 months ago." (TR 594-95). One month later, when Plaintiff saw Dr. Haque in November 2013, Plaintiff stated that she had used methamphetamine for ten years but had not used the illegal substance for five years. (TR 608-09). In November 2013, Plaintiff stated to an examiner at a hospital emergency room that she used methamphetamine. (TR 568, 576).

Because of these inconsistencies in Plaintiff's own statements regarding her illegal drug use and the evidence showing Plaintiff continued to abuse illegal

substances and to use heavy doses of prescribed narcotic and anxiolytic medications throughout 2012 and most of 2013, the diagnostic impression and opinion by Dr. Rodgers included in the October 2012 report of her consultative examination of Plaintiff are suspect.

The ALJ noted the inconsistencies in Plaintiff's statements concerning her illegal drug use and determined that those inconsistencies, along with the record showing that she had not received ongoing mental health treatment, reduced her credibility. There is substantial evidence in the record to support this credibility determination.

The ALJ further noted the diagnostic opinion of Dr. Rodgers that Plaintiff's cognitive assessment test score "would likely cause some difficulty when trying to understand, remember and follow through with both simple and complex instructions." (TR 17, 527). The ALJ reasoned that "greater weight" was accorded to the opinion of the state agency medical consultants in light of the "overall medical evidence of record" and considering that Dr. Rodgers' opinion was "based on a one-time consultative examination." (TR 17).

Dr. Shadid, a state agency medical consultant, reviewed the medical record and opined in October 2012 that Plaintiff "can understand, remember, and carry out simple tasks," "relate superficially for work-related purposes but not with the general public," and "can adapt to a work-like setting." (TR 68). In September 2013, another

state agency medical consultant, who is identified as "C.M.K., Psy. D.," reviewed the medical record and affirmed the previous consultant's assessment of a mental RFC for Plaintiff of "simple work." (TR 81).

Plaintiff relies on several district court cases and the Tenth Circuit Court of Appeals decision in <u>Chapo v. Astrue</u>, 682 F.3d 1285 (10th Cir. 2012), in arguing that the ALJ erred in evaluating Dr. Rodgers' opinion. In <u>Chapo</u>, the court stated the agency's "regulations governing medical opinions recognize [that] an examining medical source opinion is, *as such*, given particular consideration: it is presumptively entitled to more weight than a doctor's opinion derived from a review of the medical record." <u>Id.</u> at 1291. The court further stated in <u>Chapo</u> that "[a]n opinion found to be an examining rather than treating medical-source opinion may be dismissed or discounted, of course . . . based on an evaluation of all of the factors set out in the cited regulations and the ALJ must 'provide specific, legitimate reasons for rejecting it.'" <u>Id.</u> (quoting <u>Doyal v. Barnhart</u>, 331 F.3d 758, 764 (10th Cir. 2003)).

In <u>Chapo</u>, unlike the circumstances in this case, the ALJ cited the fact that the examiner was not a treating medical source as the sole reason for discounting the consultative examiner's opinion. In reversing the Commissioner's decision, the court in <u>Chapo</u> noted that the consultative examiner's findings were "not opposed" by those of any other medical source and the ALJ did not find that the consultative examiner's findings were inconsistent with other evidence in the record.

13

In this case, the ALJ provided valid reasons that are well supported by the record for giving greater weight to the opinion of the state agency medical consultants than to the opinion of Dr. Rodgers. In explaining the weight given to the medical opinions in the record, the ALJ addressed several of the factors suggested in the regulations. See 20 C.F.R. §§ 404.1527(c), 416.927(c). The ALJ reasoned that Dr. Rodgers' opinion concerning Plaintiff's mental functional ability was not consistent with the entire medical record or with the functional assessments of the state agency medical consultants. Although the ALJ did not cite to specific evidence in the record in addressing the weight given to Dr. Rodgers' opinion, the ALJ previously reviewed the medical evidence in his decision and noted that Plaintiff had forfeited her opportunity to provide testimony at the administrative hearing regarding her allegedly disabling symptoms and limitations, that she had provided inconsistent statements regarding her use of alcohol and illegal substances, and that she had not received ongoing mental health treatment.

Plaintiff also contends that the ALJ failed to address other probative evidence in the record, including the office notes of her mental health treatment between October 2013 and March 2014. However, the record of her short period of mental health treatment reflects that Plaintiff's depression and anxiety symptoms improved with medications, that her treating psychiatrist noted she exhibited normal mental status in January, February, and March 2013, and that Plaintiff voluntarily stopped

attending scheduled appointments at her treating mental health clinic after only five months. Furthermore, Plaintiff's arguments fail to address the inconsistencies in Plaintiff's own statements to medical professionals regarding her abuse of methamphetamine.

With respect to the Plaintiff's argument that the ALJ erred in failing to evaluate the findings in the report from Dr. Cruse, another consultative psychological examiner, the Plaintiff's argument is without merit. The ALJ's decision reflects consideration of Dr. Cruse's report of his May 2012 examination of Plaintiff. The ALJ specifically addressed Dr. Cruse's finding that Plaintiff's global assessment of functioning ("GAF") score was 42. The ALJ reasoned that the GAF score "is not intended for forensic purposes, such as an assessment of disability or competency or the individual's control over such behavior," citing the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders ("DSM")(Text Revision 4th ed. 2000), pages xxiii and xxvii. (TR 15-16). The most recent edition of this manual omits the GAF scale "for several reasons, including its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in descriptors) and questionable psychometrics in routine practice." American Psychiatric Association, DSM (5th ed. 2013), 16. One "low GAF score, standing alone, is insufficient because the Commissioner does not consider GAF scores to 'have a direct correlation to the severity requirements in our mental disorders

15

listings,' . . . and the current [DSM] has discontinued its use . . . ." Rose v. Colvin, 634 Fed. App'x 632, 636 (10th Cir. 2015)(unpublished op.)(quoting Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000)). The ALJ did not err in discounting the low GAF score assessed by Dr. Cruse. Dr. Cruse noted in his report of his consultative examination of Plaintiff that her "[d]rug abuse is active and ongoing," an observation that is borne out by the remainder of the record. Plaintiff's report to Dr. Cruse that she had been "evaluated for mental/emotional problems 2 years ago and diagnosed with anxiety" is not supported by the record. (TR 520). She also reported to Dr. Cruse that she stopped using methamphetamine 1½ years prior to the examination. (TR 520). This report is inconsistent with the remainder of the record. Plaintiff also reported to Dr. Cruse that she was taking "Xanax 1 mg tid" at the time of the examination. (TR 520). However, the record reflects that she was being prescribed massive doses of this medication as well as a narcotic pain medication by Dr. Valuck throughout 2010, 2011, and 2012. In light of this record, Dr. Cruse's finding that Plaintiff exhibited cognitive deficits during this examination is suspect. The ALJ did not err in failing to address these findings.

The ALJ appropriately obtained vocational testimony concerning the availability of jobs for an individual with Plaintiff's RFC for work and vocational characteristics. This testimony provides substantial evidence to support the ALJ's

step five nondisability finding. Therefore, the Commissioner's decision should be affirmed.

## RECOMMENDATION

In view of the foregoing findings, it is recommended that judgment enter AFFIRMING the decision of the Commissioner to deny Plaintiff's applications for benefits. The parties are advised of their respective right to file an objection to this Report and Recommendation with the Clerk of this Court on or before July 3rd, 2017, in accordance with 28 U.S.C. § 636 and Fed. R. Civ. P. 72. The failure to timely object to this Report and Recommendation would waive appellate review of the recommended ruling. Moore v. United States, 950 F.2d 656 (10th Cir. 1991); cf. Marshall v. Chater, 75 F.3d 1421, 1426 (10th Cir. 1996)("Issues raised for the first time in objections to the magistrate judge's recommendation are deemed waived.").

This Report and Recommendation disposes of all issues referred to the undersigned Magistrate Judge in the captioned matter, and any pending motion not specifically addressed herein is denied.

ENTERED this 13th day of June, 2017.

GARY M. PURCELL
UNITED STATES MAGISTRATE JUDGE